UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.A., a minor, by and through his legal guardians, D.A. and J.A., individuals, <br><br> Plaintiff, <br><br> v. <br><br> JEFF LUNA, Principal of Muirlands Middle School; LAMONT JACKSON, Superintendent of San Diego Unified School District, <br><br> Defendants. | Case No.: 24cv0112-LL-MMP <br><br> **ORDER DENYING PLAINTIFF'S PRELIMINARY INJUNCTION MOTION** <br><br> **[ECF No. 2]** |

Before the Court is Plaintiff J.A.'s, a minor, by and through his legal guardians, D.A. and J.A., individuals, Preliminary Injunction Motion ("Mot."). ECF No. 2. The matter is fully briefed, and the Court deems it suitable for determination on the papers and without oral argument pursuant to Civil Local Rule 7.1. For the reasons below, the Court **DENIES** Plaintiff's Preliminary Injunction Motion.

## I. BACKGROUND

New to the San Diego Unified School District ("District") public school system, Plaintiff began the eighth grade at Muirlands Middle School ("MMS") in August 2023. ECF Nos. 1, 7 ("Complaint" or "Compl.") ¶ 15; ECF No. 15-1, Jeffrey Luna's Declaration ("Luna Decl.") ¶ 4.

### A.     Plaintiff's Initial School Discipline for Race-Related Misconduct

On September 27, 2023, someone reported that Plaintiff made racist comments referencing "watermelon" and "fried chicken" to a black classmate. *Id.* ¶ 6, Ex. B. Defendant Jeffrey Luna, principal of MMS, met with Plaintiff. In a written statement, Plaintiff admitted he made the comments but maintained they were a "joke." *Id.* ¶ 6, Ex. A. Defendant Luna documented an incident report in Plaintiff's student record under the behavior code "Hate Incident – Offensive Comment." *Id.* ¶ 6. The students had to be separated in class. *Id.* Per District restorative discipline policies, Plaintiff was also assigned online character playbook modules to complete. *Id.* ¶ 7, Ex. C. Plaintiff started but did not complete the assignments. *Id.*

### B.     La Jolla High School's Events and Expectations

Charles Podhorsky is principal of La Jolla High School ("LJHS"), another District school. ECF No. 15-3, Charles Podhorsky's Declaration ("Podhorsky Decl.") ¶ 2. LJHS is adjacent to MMS, and MMS students matriculate into LJHS. *Id.* ¶ 3; Opp. at 9. Defendant Luna emailed a link of Podhorsky's requirements and expectations for attendance at LJHS's sporting events to MMS parents. Luna Decl. ¶ 8, Ex. D. It explained in part:

- "All students through 8th grade are to enter the game with an adult;"
- "All students must be on LJHS side during the game. Do not wander around;"
- "Be respectful of other students and adults attending the game;"
- "Unacceptable behaviors" include "Disruptive or unruly behavior," "Foul or abusive behavior or obscene gestures," and "Rudeness to fellow fans or [LJHS] personnel."

### C.     La Jolla High School's October 13, 2023 Football Game

On October 13, 2023, Plaintiff attended a LJHS home football game against Morse High School ("MHS"), another District school. Compl. ¶ 16; Luna Decl. ¶ 9. Plaintiff did not have warrior eyeblack on his face when he arrived at the game. Compl. ¶ 18. As the game progressed, a friend put warrior eyeblack on Plaintiff's face. *Id.* ¶ 20. Plaintiff wore it for about fifteen-to-thirty minutes before leaving the game. *Id.* ¶ 22.

### D. Report and Investigation of Race-Related Misconduct at La Jolla High School's October 13, 2023 Football Game

On October 17, 2023, MHS's principal contacted Podhorsky to relay a report she received from MHS's cheer coach. Podhorsky Decl. ¶ 6; Luna Decl. ¶ 10. According to the cheer coach, a group of particularly young boys on MHS's side of the field—at least one of whom had a lot of black paint on his face—uttered racial slurs like "nigga" this and "nigga" that while another said "you can say" it. *See* Podhorsky Decl. ¶ 6; Luna Decl. ¶ 10. The group of boys made these comments where MHS cheerleaders, students, and fans could see and hear them. Luna Decl. ¶ 10. LJHS staff reviewed surveillance video from that night and identified at least one student who had a lot of black paint on his face while on MHS's side of the field. Podhorsky Decl. ¶ 6. They also saw that it was not on his face until two hours into the game. *Id*. LJHS staff did not recognize the student, so they forwarded the surveillance video and images to MMS along with the information it had from MHS. *Id.*; Luna Decl. ¶ 10. MMS took over the investigation. *Id*. Each administration considered the cheer coach's report credible and serious. *Id.*

Jennifer Nash, associate principal of MMS, assisted with the investigation. ECF No. 15-2, Jennifer Nash's Declaration ("Nash Decl.") ¶¶ 2–3. After reviewing the surveillance video and images, MMS staff confirmed it implicated its students. Luna Decl. ¶ 11. It showed Plaintiff's face covered in a lot of black paint, that it was not put on until two hours into the game, and that it was put on at MHS's side of the field. *Id*., Ex. E. Plaintiff then walked in front of MHS's stands with MHS cheerleaders to his left. *Id*. MMS staff identified two more of its students with Plaintiff: R.R., who also had a lot of black paint on his face, and B.S., who did not have black paint on his face. Luna Decl. ¶ 11.

Based on these findings, Defendant Luna individually met with B.S., R.R., and Plaintiff. *Id.* ¶ 12. Defendant Luna says he described the preceding report and investigation of race-related misconduct at the game, and gave each student an opportunity to respond. *Id*. Nobody offered specifics when prompted, he says, but they all wrote statements. *Id*. B.S. reported that he was with Plaintiff and R.R. while they had black paint on their faces.

*Id.* ¶ 12, Ex. F. R.R., who, like Plaintiff, also had a recent incident for race-related misconduct at school, reported that he had black paint on his entire face and confirmed he was with Plaintiff and B.S. Luna Decl. ¶¶ 12–13, Ex. G. Finally, Plaintiff reported that he had black paint on his face, but not as much as R.R. Luna Decl. ¶ 12, Ex. H.

For all these reasons, Defendant Luna determined that Plaintiff and R.R. partook in a hateful incident by going to MHS's side of the field, wearing significant amounts of black paint on their faces, where at least one of them uttered racial slurs like "nigga" this and "nigga" near MHS students while another encouraged it. Luna Decl. ¶ 13. Defendant Luna concluded that two-day suspensions were needed for each student given the circumstances, including their prior race-related misconduct and the ineffectiveness of earlier corrective measures. *Id.* ¶¶ 13–14. He documented incident reports in their student records as an "Offensive Comment, intent to harm," under the category "Hate Incidents – Grades 4-12 only." *Id.* ¶ 14. Nash supported Defendant Luna's reasoning and decision. Nash Decl. ¶ 4. In addition, LJHS "shared that neither student is allowed to attend any further LJHS extracurricular activities for the remainder of the year." *Id.*; Luna Decl. ¶ 14.

### E. Plaintiff's Two-Day Suspension Appealed and Upheld

On October 18, 2023, the same day of these meetings, Defendant Luna called R.R. and Plaintiff's parents to notify them of the suspensions. Luna Decl. ¶ 15. He mailed written notices to the parents. *Id.*, Exs. I, J. He also met with the parents a few days later to discuss the suspensions in person. Compl. ¶ 36; Luna Decl. ¶ 16.

Plaintiff's parents appealed their son's suspension to the District's Office of Placement and Appeals. Compl. ¶ 56; ECF No. 1-2, Exs. B, C; Luna Decl. ¶ 17. The appeal was denied. *Id.* They then filed a complaint with the District's Office of Compliance, Investigations, and Accountability. Luna Decl., Ex. K. That complaint was also denied. *Id.*

### F. Plaintiff's Complaint and Preliminary Injunction Motion

On January 16, 2024, Plaintiff, through his parents, sued Defendant Luna and Defendant Lamont Jackson, the District's superintendent. *See* Compl. Plaintiff alleges violations of his rights under the First Amendment and the Fourteenth Amendment's Due

Process Clause and Equal Protection Clause. *See id*. In addition to monetary damages, Plaintiff requests two types of relief: (1) *Enjoin* Defendants from keeping any "sanction" against him "*on account of his constitutionally protected speech*," including "removing J.A.'s sporting-event ban"[1] and "expunging" all "references to the incident in question" like the two-day suspension from his "school records;" (2) "*Declare* that the disciplinary actions taken against J.A. for this incident violate J.A.'s rights under the First and *Fourteenth Amendments*." *See id*. at 18 (emphases added).

That same day, Plaintiff moved this Court to preliminarily award his injunctive relief, again, solely "on account of his constitutionally protected speech." *See* Mot. at 13.[2] Defendants filed an Opposition ("Opp.") to Plaintiff's Preliminary Injunction Motion, and Plaintiff filed a Reply ("Reply"). ECF Nos. 13, 16. Defendants also filed evidentiary objections to the declarations filed in support of the Reply.[3] ECF No. 17.

---

[1] Defendant Luna states that the sporting-event ban was LJHS prohibiting Plaintiff and R.R. from attending "any further LJHS extracurricular activities for the remainder of the year" starting October 2023. *See* Luna Decl. ¶ 14; Nash Decl. ¶ 4, Ex. A. Plaintiff remained free to participate in and attend sporting events at other District schools, including MMS, after his two-day suspension. Instead, Plaintiff's parents withdrew him from MMS and presumably resumed his homeschooling. *See* Luna Decl. ¶ 4. Conversely, Plaintiff says that Defendant Luna told him he could not attend any District sporting events for the rest of the school year. *See* Compl. ¶ 61. Regardless of scope, the ban has expired. Accordingly, Plaintiff's request to lift the sporting-event ban is **DENIED AS MOOT**.

[2] The Court emphasizes that Plaintiff's request for a preliminary injunction is based solely "on account of his constitutionally protected speech," that is, the First Amendment. *See* Compl. at 18; Mot. at 13. Opining on the likelihood of any due process or equal protection violations under the Fourteenth Amendment—for which Plaintiff seeks final, declaratory relief—is inappropriate at this stage. The Court therefore limits its merits review for whether a preliminary injunction is warranted to any First Amendment violation.

[3] "Due to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d

## II. LEGAL STANDARD

An "injunction is a drastic and extraordinary remedy." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). It "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Under *Winter*'s preliminary injunction test, a plaintiff must establish that: (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest." *Id*. at 20.

## III. DISCUSSION

### A. Success on the Merits

Success on the merits "is the most important." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856. Plaintiffs must typically show a "likelihood" or "probability" of prevailing. *Coffman v. Queen of the Valley Med. Ctr.*, 895 F.3d 717, 725 (9th Cir. 2018). But under the Ninth Circuit's "sliding scale" approach, a plaintiff who merely raises "serious questions" on the merits is still entitled to preliminary relief if the other elements are met and the balance of equities "tips sharply in the plaintiff's favor." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023); *see Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984) (defining a "serious question" as having "a fair chance of success on the merits").

---

1239, 1250 n.5 (9th Cir. 2013). As such, courts may consider evidence outside the normal rules of evidence, including pleadings, "hearsay," "exhibits," and "declarations." *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009). While "courts may consider inadmissible evidence in the context of a preliminary injunction, this does not mean that evidentiary issues have no relevance to this proceeding. Such issues, however, properly go to weight rather than admissibility." *Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 119 F. Supp. 3d 1177, 1185 (C.D. Cal. 2015). In light of this "relaxed evidentiary standard" for a preliminary injunction proceeding, the Court "need not rule on admissibility" at this stage. *Disney Enters., Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 966 n.1 (C.D. Cal. 2016). Accordingly, Defendants' evidentiary objections are **OVERRULED**.

1. **The First Amendment**

The "First Amendment guarantees wide freedom in matters of adult public discourse," but that does not mean that "the same latitude must be permitted to children in a public school." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). The "First Amendment rights of students in the public schools are not automatically coextensive with the rights of adults in other settings" and "must be applied in light of the special characteristics of the school environment." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (quotation marks omitted). A "school need not tolerate student speech that is inconsistent with its basic educational mission," for instance, "even though the government could not censor similar speech outside the school." *Id*. (quotation marks omitted). "Without limiting any 'political viewpoint' or other protected content, schools may insist on 'civil discourse' in the school context, thereby teaching and reinforcing 'the shared values of a civilized order.' " *Chen ex rel. Chen v. Albany Unified Sch. Dist.*, 56 F.4th 708, 717 (9th Cir. 2022) (quoting *Fraser*, 478 U.S. at 685).

Moreover, the "school's regulatory interests remain significant in some off-campus circumstances." *Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*, 594 U.S. 180, 188 (2021). In *Mahanoy*, it was "held that public schools may regulate *some* off-campus student speech, but it made clear that public schools have diminished authority to regulate off-campus speech as opposed to on-campus speech." *Chen*, 56 F.4th at 719.

In addition to verbal and written speech, the First Amendment covers "purely expressive activity" and "conduct with an expressive component." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1059 (9th Cir. 2010). Examples of purely expressive activities include "music without words, dance, topless dancing, movies, parades with or without banners or written messages," "tattoos," and certain "paintings."[4] *Id*. at 1060–61

---

[4] *See White v. City of Sparks*, 500 F.3d 953, 956 (9th Cir. 2007) ("So long as it is an artist's self-expression, a painting will be protected under the First Amendment, because it

(citations omitted). Such activities can be thought of as inherently expressive, "entitled to full First Amendment protection," without much showing. *See id.* at 1059.

Conversely, "conduct that can be used to express an idea but does not necessarily do so" is "constitutionally protected only if it is sufficiently imbued with elements of communication," meaning "that an intent to convey a particularized message is present, and the likelihood is great that the message will be understood by those who view" the conduct. *Id.* at 1058–59 (citing *Spence v. Washington*, 418 U.S. 405, 409–11 (1974) (per curiam) (quotation marks and alterations omitted)). This is known as the *Spence* test. "Burning a flag, burning a draft card, and wearing a black armband can be done for reasons having nothing to do with any expression, and so require an interpretive step to determine the expressive elements of these processes." *Id.* at 1061 (citations omitted); *see also Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 584 U.S. 617, 657 (2018) (Thomas, J., concurring in part and in the judgment) (listing additional examples). It is "the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984).

Similar to the Ninth Circuit in *Anderson*, the Court first categorizes whether the conduct alleged in its case—here, wearing eyeblack on one's face—is "purely expressive activity" or "conduct that merely contains an expressive component." *Anderson*, 621 F.3d at 1059. People can and do wear eyeblack on their faces merely to reduce glare from a playing field's lights, camouflage in an evening game of hide-and-seek, or passively do what a friend is doing without any intent to express an idea. Because wearing eyeblack on one's face can be done for reasons having nothing to do with any expression, it is mere

---

expresses the artist's perspective."); *id.* at 956 n.4 ("We expressly reserve the question whether all paintings merit First Amendment protection. We are not asked to decide the protection accorded to paintings that are copies of another artist's work or paintings done in an art factory setting where the works are mass-produced by the artist or others.").

conduct with an expressive component that is constitutionally protected only if it passes the *Spence* test. Plaintiff, then, must show that he intended to convey a "particularized message" through wearing eyeblack on his face during the night in question, and that "in the surrounding circumstances," the "likelihood was great" that those who viewed it would understand the message. *See Spence*, 418 U.S. at 410–11; *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (noting the same test).[5]

Plaintiff's request for an injunction is based solely "on account of his constitutionally protected speech." *See* Compl. at 18; Mot. at 13. He also denies making "any race-related comments" during the night in question. *See* ECF No. 16-1, J.A.'s Declaration ("J.A. Decl.") ¶¶ 6, 8. Therefore, unless Plaintiff shows there is a likelihood or at least a fair chance that wearing eyeblack on his face that night was expressive conduct, his request for a preliminary injunction fails at the outset.

---

[5] In *Hurley*, it was noted that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." *Hurley v. Irish-American Gay, Lesbian, and Bisexual Grp. of Bos*., 515 U.S. 557, 569 (1995) (omitting citation to *Spence*). This Circuit suggested that this *Hurley* note may refer to purely expressive activities, separate and apart from the *Spence* test. *See Anderson*, 621 F.3d at 1060. Later, referencing the same *Hurley* note along with *Clark*, this Circuit noted that a "viewer need not understand the speaker's particularized message," the "message need only be delivered by conduct that is intended to be communicative and, in context, be understood by the viewer to be communicative." *Krishna Lunch of S. Cal., Inc. v. Gordon*, 797 F. App'x 311, 313 (9th Cir. 2020) (quotation marks omitted). The Court takes these relaxed articulations in account when reasoning below, and notes that other circuits have their own commentary. *See, e.g*., *Church of Am. Knights of the Ku Klux Klan v. Kerik,* 356 F.3d 197, 205 n.6 (2d Cir. 2004) ("While we are mindful of *Hurley*'s caution against demanding a narrow and specific message before applying the First Amendment, we have interpreted *Hurley* to leave intact the Supreme Court's test for expressive conduct in *Texas v. Johnson* . . . an activity need not necessarily embody 'a narrow, succinctly articulable message,' but the reviewing court must find, at the very least, an intent to convey a 'particularized message' along with a great likelihood that the message will be understood by those viewing it." (citations omitted)).

  In this lawsuit, Plaintiff alleges that the message he intended to convey through wearing warrior eyeblack on his face during the LJHS game in question was "spirit" and "support." *See* Mot. at 3–4, 8–10. Based on the picture Plaintiff provides of himself that night, the eyeblack covers about half of his face. *See* Compl. ¶¶ 21–22. Plaintiff argues people would have clearly understood his message because attendees shared eyeblack and other face paint with each other; half of the attendees (a hundred people) wore some sort of face paint; a black security guard and others complimented him on his eyeblack design; he did not utter racial slurs; no one said anything negative or otherwise told him to stop; and people have worn eyeblack during other LJHS football games, including at designated blackout games. *See* Compl. ¶¶ 18–22; Reply, at 4–6; ECF No. 16-2, Juliet A.'s Declaration ("Juliet A. Decl.") ¶¶ 8–12, Exs. A–F.

  Defendants, and the record thus far, undermine the likelihood of Plaintiff's story. Podhorsky, LJHS's principal for the last decade, says he attended the entire game and did not see a single fan wearing eyeblack on his or her face. Podhorsky Decl. ¶ 4. He says this is consistent with his experience supervising most of the LJHS varsity football games. *Id.* ¶ 5. At times students wear small LJ stickers or the like on their cheeks, he explains, but nothing as pronounced as what the players sport. *See id.* Internet searches reveal that there are photographs of fans wearing black paint on their faces in various designs during other LJHS football games, but nothing as pronounced as the black paint on Plaintiff's face during the game in question. *Compare* Juliet A. Decl., Exs. A–F *with* Luna Decl., Ex. K.

  Regardless of just how common certain colors and designs of face paint are for fans to wear during LJHS football games, the focus remains on Plaintiff's conduct during this particular game and how that audience would have understood it. In addition to Podhorsky, Defendant Luna attended most of this game as well. Luna Decl. ¶¶ 8–9. He saw LJHS players, cheerleaders, and fans wear pink in recognition of Breast Cancer Awareness Month, but, like Podhorsky, no fans wearing eyeblack on their faces. *Id.* ¶ 9. Importantly, after reviewing the surveillance video provided by LJHS, MMS staff only identified Plaintiff and his two friends, R.R. and B.S., as persons of interest. *Id.* ¶ 11.

Plaintiff and his friends, B.S. and R.R., each wrote statements in response to their meetings with Defendant Luna. Luna Decl., Exs. F–H. B.S. wrote that one of his friends—who he does not name—"had a bunch of eyeblack on his face," but washed it off after B.S. told him "what it meant." *Id*., Ex. F. B.S. then wrote that R.R. and Plaintiff had "wings" on their face, "but not that much." *Id*. This account is inconsistent with R.R.'s written statement, where he admits that he is the one who had a bunch of eyeblack on his face but then washed it off after he "figured out what it meant." Luna Decl., Ex. G. R.R. refused to name who put the black paint on his face because he didn't want to get them in trouble. *Id*. Plaintiff does not offer much more detail, writing that a friend put black paint on Plaintiff's face but not as much as R.R.'s face. Luna Decl., Ex. H. Defendant Luna notes that Plaintiff was "defensive" and "not credible" or "forthcoming regarding why he and R.R. had put black face paint on" their faces. Luna Decl. ¶¶ 12–13. Notably, contrary to what Plaintiff alleges in this lawsuit, Plaintiff never claimed he meant to show spirit or support through the black paint on his face at that time. *See id*. R.R., who does not appeal his two-day suspension, did not claim that he meant to show spirit or support through the black paint on his face either. *See* Luna Decl., Ex. G; Opp. at 7.

Moreover, the District's Office of Compliance, Investigations, and Accountability denied Plaintiff's complaint regarding this incident in a thorough opinion. *See* Luna Decl., Ex. K. There, it specifies reports from a MHS cheer coach and students who saw and heard particularly young boys running around saying "nigga" this and "nigga" that on MHS's side of the field, you "can say it now," and someone with a lot of eyeblack on his face yelling "I can say it now." *See id*. The surveillance video confirms that the place of this incident matches where Plaintiff and his friends were on MHS's side of the field and that Plaintiff had eyeblack on about half of his face. *See id*.

It is Plaintiff's burden to show that the First Amendment applies to his conduct. It is unclear what kind of message, if any, Plaintiff meant to convey in wearing eyeblack on about half of his face during that LJHS football game. Even if part of a message were to convey a sort of spirit or support at the game, Plaintiff stops short of specifying for which

11

team. *See* Compl. ¶¶ 1, 22, 68 (describing Plaintiff's conduct as intending to "show spirit for the team," "show spirit for the football team," and "show spirit at the Game"); Mot. at 3–4, 10 (describing Plaintiff's conduct as intending to "express spirit and support at a high school football game," "show spirit at the Game," and "show spirit and cheer for the team"); J.A. Decl. ¶ 5 ("I asked to have it put on because it looked fun and I wanted to join in showing fan spirit . . . I thought nothing of it."). LJHS and MMS are next to one another on the very same street with a single cross street separating them, so presumably Plaintiff attended to watch and cheer for LJHS. That, however, is in tension with Plaintiff only having eyeblack put on his face while on MHS's side of the field towards the end of the game, where he does not appear to watch the game. *See* Luna Decl. ¶ 13, Ex. E.

In any event, under these circumstances, it is not likely that Plaintiff intended to convey a particularized message in wearing eyeblack that night. "With respect to the first requirement—an intent to convey a particularized message—First Amendment protection is only granted to the act of wearing particular clothing or insignias where circumstances establish that an unmistakable communication is being made." *Edge v. City of Everett*, 929 F.3d 657, 668 (9th Cir. 2019); *see, e.g.*, *id.* (listing "symbols of ideology in parade," "a jacket bearing the inscription 'F— the Draft,' " and "black armbands to protest Vietnam War"). Plaintiff wearing eyeblack on about half of his face during the last quarter of LJHS's October 13, 2023 football game to purportedly show a more or less aimless "spirit" is far from these unmistakable cases. *See also Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 389–90 (6th Cir. 2005) (finding that the plaintiff's message, "which in this instance amounts to nothing more than a generalized and vague desire to express her middle-school individuality," is not so particularized to fall "within the umbrella of protection provided by the First Amendment"); *Cheadle ex rel. N.C.*, 555 F. Supp. 3d, 726, 734–35 (W.D. Mo. 2021) (noting that "[n]othing in the facts indicate that [the conduct] was associated with a protest against the school or government, a hallmark of expressive conduct").

Assuming Plaintiff's rather general message of spirit at the game was particularized, that message still seems to have been lost when Plaintiff chose to run around on MHS's

side of the field with his friends. This includes a friend, R.R., who had his entire face blackened. *See* Luna Decl., Ex. K. MHS students saw, heard, and reported a group of such boys, including the use of racial slurs like "nigga" by at least one of them while another egged him on. *See id*.

Under these circumstances, there being a great likelihood those on MHS's side of the field would have understood any message conveyed through Plaintiff's eyeblack is not probable. *See Bivens ex rel. Green v. Albuquerque Pub. Sch.*, 899 F. Supp. 556, 560–61 (D.N.M. 1995) (dismissing the plaintiff's claim "that his wearing of sagging pants is constitutionally protected speech" because he failed to show "a great likelihood that the message would be understood by those who observe the conduct"); *id*. at 560 ("The wearing of a particular type or style of clothing usually is not seen as expressive conduct."); *Troster v. Pa. State Dept. of Corrs.*, 65 F.3d 1086, 1092 (3d Cir. 1995) (finding that a state corrections officer "passively wearing the [American] flag patch" on his uniform was not expressive conduct because "[o]bservers might perhaps *infer* that the wearer is patriotic, but [the plaintiff] put on no evidence that observers would likely understand the patch or the wearer to be *telling* them anything about the wearers' beliefs").

Based on the current record, it is not likely that Plaintiff can prevail on the merits of his First Amendment claim, nor are there serious questions about it. It "is possible to find some kernel of expression in almost every activity a person undertakes," such as "walking," "meeting one's friends," or "coming together to engage in recreational dancing" and other sports,[6] "but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *See City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989).

---

[6] Courts "have generally rejected claims that athletic activities trigger First Amendment protection," including "spectator sports." *J.T. v. City & Cnty. of San Francisco*, No. 23-cv-06524-LJC, 2024 WL 3012791, at *9 (N.D. Cal. June 13, 2024); *see, e.g., Justice v. Nat'l Collegiate Athletic Ass'n,* 577 F. Supp. 356, 374 (D. Ariz. 1983) ("Intercollegiate football . . . is primarily a conduct-oriented activity; as such, it is not entitled to the same First

1  Without meeting this showing for his alleged First Amendment violation, upon
2  which Plaintiff bases his request for an injunction, preliminary relief cannot be awarded.
3  *See Disney Enters.*, 869 F.3d at 856 (noting that without "serious questions going to the
4  merits," courts "need not consider the other factors"). Nonetheless, for good measure, the
5  Court continues its analysis.

### B. Other *Winter* Factors

"Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

"If the suspension is not removed from his school records," Plaintiff argues, "it could impact his acceptance into the school of his choice." Mot. at 11–12; *see also* Reply at 11 (arguing that keeping the two-day suspension on his school record "may make a difference" for acceptance into a high school, college, and other positions beyond). This is speculative. One does not apply to his or her local public high school. One does apply to select private high schools, but Plaintiff has not said he plans to apply to one, only that he and his parents "have been considering" it. *See* Juliet A. Decl. ¶ 15. Plaintiff has also not established a likelihood that the unspecified institutions or employers he may or may not apply to in the years to come will ask about his middle school records, let alone use his two-day suspension as the reason to deny him. Courts find these types of contingent arguments to be speculative. *See S.J.W. v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 779 (8th Cir. 2012) (declining to find irreparable harm when the plaintiffs' 180-day suspensions from their preferred high school still allowed them to attend an "an accredited school in the same district" and noting that the claims of harm to their "careers in college and beyond" was

---

Amendment protection that other more 'communicative' forms of entertainment have been afforded."). Even if there are ways for those watching largely non-expressive sports like football to engage in expressive conduct, there are not serious questions going to whether Plaintiff wearing eyeblack on about half of his face to purportedly express a more or less general, aimless support at LJHS's October 13, 2023 football game was one of those ways.

"speculative"); *see also George v. Grossmont Cuyamaca Cmty. Coll. Dist. Bd. of Governors*, No. 22-cv-0424-BAS-DDL, 2022 WL 16722357, at *19–20 (S.D. Cal. Nov. 4, 2022) (noting cases in different contexts and finding the same).

Plaintiff's argument that his two-day suspension from MMS constitutes an "ongoing First Amendment injury" is without merit. *See* Mot. at 11. Plaintiff no longer attends MMS. Additionally, Plaintiff fails to show how a two-day suspension from a school he no longer attends limits his First Amendment rights currently or at any time in the future.

Without more, Plaintiff has not shown that irreparable harm is likely to occur absent a preliminary injunction. Because of this, his request must also be denied. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (holding that, even under a sliding scale, a failure to show "a likelihood of irreparable injury" prevents the award of a preliminary injunction).

The Court declines to continue its analysis for whether a balance of the equities tips sharply in Plaintiff's favor and whether an injunction is in the public interest. Instead, it simply notes that its findings would largely rely on the issues previously discussed.

## IV. CONCLUSION

"In evaluating the likelihood of success on the merits," or the other *Winter* prongs, "a court does not decide whether the movant will ultimately win." *See Cheadle*, 555 F. Supp. 3d at 732 (quotation marks omitted). Based on the current record, Plaintiff has not shown that he is entitled to the drastic and extraordinary remedy of injunctive relief. Accordingly, the Court **DENIES** Plaintiff's Preliminary Injunction Motion.

**IT IS SO ORDERED.**

Dated: September 30, 2024

Honorable Linda Lopez
United States District Judge